OPINION
{¶ 1} Plaintiff-appellant, James L. Kendig, appeals from a judgment of the Franklin County Court of Common Pleas denying plaintiff's post-trial motion for judgment notwithstanding the verdict or, in the alternative, for new trial. Because the trial court committed no reversible error, we affirm.
 {¶ 2} On June 9, 1997, plaintiff's left arm was crushed in a work-related injury when his arm was pinned between two forklifts. Emergency squad personnel treated plaintiff at the scene of the injury. A co-worker then brought plaintiff to Mount Carmel East Hospital in Columbus, Ohio, for further treatment. At the hospital, Mark A. Smith, M.D., an emergency room physician, examined plaintiff. Although Dr. Smith found swelling and tenderness of plaintiff's proximal forearm, Dr. Smith determined neurovascular and tendon functions of plaintiff's hand were intact. Dr. Smith evaluated sensation, motor function and capillary refill, which Dr. Smith described as "good," and ordered an x-ray of plaintiff's injured arm, which revealed plaintiff did not have a fracture. Dr. Smith treated plaintiff's pain with medication.
 {¶ 3} By telephone, Dr. Smith informally consulted with an orthopedic surgeon, Dr. Bombach, to review his clinical findings, but Dr. Smith did not request a formal orthopedic consultation. Following his telephone discussion with Dr. Bombach, Dr. Smith reviewed aftercare instructions with plaintiff and arranged to have plaintiff's arm placed in a splint. Dr. Smith's aftercare instructions included directions to elevate plaintiff's injured arm, apply ice, and loosen and loosely re-wrap the bandage if the bandage felt too tight. The aftercare instructions also directed plaintiff to return to the emergency room or contact Dr. Bombach if plaintiff experienced paleness or purpleness to the hand, numbness, tingling in the hand, difficulty in wiggling or moving his fingers or increased pain. Plaintiff was instructed to arrange a follow-up visit with Dr. Bombach early within the following week. Dr. Smith had no direct contact with plaintiff following plaintiff's discharge from the emergency room.
 {¶ 4} After plaintiff's discharge, plaintiff's mother assisted him. In addition to having plaintiff's medication prescription filled, and arranging a follow-up appointment with Dr. Bombach for June 16, 1997, plaintiff's mother also contacted the emergency department at Mount Carmel East Hospital because plaintiff was experiencing increased pain. According to plaintiff's mother, during the telephone call to the emergency department, the female staff member with whom she spoke did not inquire whether plaintiff's hand was pale, whether plaintiff was experiencing tingling or numbness in his hand, whether plaintiff had difficulty wiggling his fingers, or whether plaintiff had experienced increased pain. After taking a telephone number where plaintiff's mother could be reached, the staff member, who was later identified as a nurse, called plaintiff's mother and instructed her to pick up a new pain medication prescription at the emergency department. Plaintiff's mother complied with the instruction and took the prescription to a pharmacy to have it filled.
 {¶ 5} At trial, the nurse with whom plaintiff's mother spoke testified she did not have any specific recollection concerning the telephone conversations with plaintiff's mother and did not recall giving plaintiff's mother the new prescription. However, a handwritten notation in plaintiff's medical chart dated June 9, 1997, signed by the nurse, indicated a new prescription "was written by Dr. M. Smith @ 1745 to be picked by family member." At trial, the nurse also testified about her usual procedure for handling telephone calls to the emergency room, which included reviewing a patient's chart and determining whether any clinical changes had occurred since the patient was discharged from the emergency room. The medical record, however, does not reflect any notation indicating the nurse reviewed any clinical changes with plaintiff's mother or spoke with Dr. Smith.
 {¶ 6} Although the emergency room nurse had no specific recollection concerning her contacts with plaintiff's mother, Dr. Smith recalled his exchange with the emergency room nurse. At trial, Dr. Smith testified plaintiff's family contacted the emergency department and requested a stronger pain medication. Dr. Smith recalled he expressed his concern to the emergency room nurse that plaintiff was at risk for development of compartment syndrome. According to Dr. Smith, the nurse informed him she had reviewed plaintiff's symptoms with the caller and plaintiff did not show signs of compartment syndrome. Dr. Smith then changed plaintiff's pain medication to a different type of narcotic because, according to Dr. Smith, patients may have varied reactions to different pain medications.
 {¶ 7} According to plaintiff's mother, the following day, June 10, 1997, plaintiff was still experiencing significant pain, so plaintiff's mother called Dr. Bombach's office and unsuccessfully attempted to arrange an earlier appointment for plaintiff. On June 11, 1997, plaintiff continued to experience significant pain and plaintiff's mother again contacted Dr. Bombach's office to arrange an earlier appointment, but her attempt again was unsuccessful. Later that same day, plaintiff's girlfriend brought plaintiff back to Mount Carmel East Hospital where plaintiff presented with complaints of pain and swelling in his left arm. According to medical records from the emergency room visit, plaintiff reported the swelling had begun on June 10, 1997, but in direct trial testimony, plaintiff contended swelling was present before he left the emergency room on June 9, 1997. After diagnosing plaintiff's condition as compartment syndrome, Robert A. Martin, M.D., performed a volar fasciotomy with debridement on June 11, 1997. Plaintiff also underwent additional surgical debridement on June 14, 1997, plastic surgery on June 18, 1997, and subsequent physical therapy. Even with the medical interventions, plaintiff suffered muscle loss, loss of grip strength and loss of sensation in his left hand.
 {¶ 8} On December 2, 1998, plaintiff filed a medical malpractice action against Robert A. Martin, M.D., Columbus Orthopedic Surgeons, Inc., Mark A. Smith, M.D., Emergency Services, Inc., and Mount Carmel Health Systems dba Mount Carmel East Hospital. Plaintiff, without prejudice, voluntarily dismissed Mount Carmel Health Care Systems, and later without prejudice, voluntarily dismissed Robert A. Martin, M.D., and Columbus Orthopedic Surgeons, Inc. At the time of trial, only two defendants remained, Mark A. Smith, M.D., and Emergency Services, Inc. Trial proceeded under a theory of successive tortfeasor liability in which plaintiff contended Dr. Smith was liable for his own alleged negligence and for Dr. Martin's alleged subsequent negligence. See, e.g., Tanner v. Espey (1934), 128 Ohio St. 82; Traster v. Steinreich (1987), 37 Ohio App.3d 99.
 {¶ 9} At trial, plaintiff's expert, John W. Dietrich, M.D., a board certified orthopedic surgeon with a certificate of added qualification in hand surgery, testified Dr. Smith's practice fell below the standard of care when Dr. Smith (1) failed to suspect a compartment syndrome, given the mechanism of plaintiff's injury, (2) failed to recognize the presence of pain not in proportion to the physical findings suggested a developing compartment syndrome, (3) failed to obtain a formal orthopedic consultation, (4) failed to obtain compartment measurements of plaintiff's injured arm, (5) failed to admit plaintiff to the hospital for observation, (6) prescribed a stronger pain medication without re-evaluating plaintiff, and (7) provided plaintiff with incorrect aftercare instructions. Dr. Dietrich also opined that Dr. Martin's volar fasciotomy was incomplete because Dr. Martin failed to decompress the median nerve as it entered the carpal tunnel, and that plaintiff's muscle loss, permanent loss of grip strength and loss of sensation in his left hand may have been lessened if plaintiff had received a fasciotomy earlier than he did. Moreover, Dr. Dietrich disputed Dr. Martin's conclusions that plaintiff's flexor superficialis ruptured due to trauma to plaintiff's left arm.
 {¶ 10} In contrast, defendants' expert, Michael Ruff, M.D., a board certified orthopedic surgeon, opined that Dr. Martin expediently treated plaintiff and Dr. Martin's fasciotomy was adequate to relieve compartment pressure. Dr. Ruff further opined that, if plaintiff's compartment syndrome had existed for 48 hours or more, additional damage and necrotic tissue would have been expected than was found at the time of plaintiff's first surgery. Based on the amount of necrosis, Dr. Ruff opined plaintiff had experienced a full-blown compartment syndrome approximately eight to ten hours before undergoing the fasciotomy.
 {¶ 11} Another defense witness, Dr. Robert Martin, a former defendant in the action and a board certified orthopedic surgeon, testified his clinical findings at the time he performed plaintiff's fasciotomy supported the earlier testimony of Dr. Ruff concerning the amount of necrotic tissue Dr. Martin found at the time of the fasciotomy, and its significance to the onset of plaintiff's compartment syndrome. Dr. Martin also testified about his treatment of plaintiff and the underlying rationale for his treatment decisions.
 {¶ 12} James Hoekstra, M.D., a board certified emergency department physician, testified his review of the medical records indicated plaintiff had a contusion, not compartment syndrome, at the time Dr. Smith treated plaintiff. Based on his review, Dr. Hoekstra testified Dr. Smith's treatment was within the accepted standard of care. In addition, Dr. Smith himself testified on his own behalf about his treatment of plaintiff.
 {¶ 13} By jury verdict, seven members of an eight-member panel found in favor of Dr. Smith and Emergency Services, Inc., and the trial court entered judgment in their favor. Plaintiff moved for judgment notwithstanding the verdict or, in the alternative, for a new trial, but the trial court denied plaintiff's post-trial motion. Plaintiff appeals, assigning three errors:
 {¶ 14} "I. The trial court erred in denying plaintiff-appellant's motion for judgment notwithstanding the verdict when there was no evidence upon which reasonable minds could reach different conclusions as to the issues of negligence and proximate cause.
 {¶ 15} "II. The trial court erred in denying plaintiff-appellant's motion for new trial when the judgment is not sustained by the weight of the evidence.
 {¶ 16} "III. The trial court erred in failing to submit jury instructions as established by the evidence presented at trial when it failed to instruct the jury that the issue in plaintiff-appellant's case was whether the defendant-appellee fell below the standard of care when he failed to manage and/or treat a crush injury."
 {¶ 17} To establish medical malpractice, "it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things." Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, paragraph one of the syllabus. Further, "[t]he standard of care for a physician or surgeon in the practice of a board-certified medical or surgical specialty should be that of a reasonable specialist practicing medicine or surgery in that same specialty in the light of present day scientific knowledge in that specialty field[.]" Id. at paragraph two of the syllabus.
 {¶ 18} "The standard for granting a motion for judgment notwithstanding the verdict or in the alternative for a new trial pursuant to Civ.R. 50(B) is the same as that for granting a motion for a directed verdict pursuant to Civ.R. 50(A)." Texler v. D.O. Summers Cleaners Shirt Laundry Co. (1998), 81 Ohio St.3d 677, 679. "When considering a motion for a directed verdict, a court must construe the evidence most strongly in favor of the party against whom the motion is directed. * * * A court considering a motion for directed verdict must determine not whether one version of the facts presented is more persuasive than another; rather, the court must determine whether the trier of fact could reach only one result under the theories of the law presented in the complaint. * * * Where there is substantial competent evidence favoring the nonmoving party so that reasonable minds might reach different conclusions, the motion must be denied." Tulloh v. Goodyear Atomic Corp. (1994), 93 Ohio App.3d 740, 747. (Citations omitted.) See, also, Aldahan v. Tansky Sales, Inc. (June 20, 2000), Franklin App. No. 99AP-651; and Shepherd v. Westlake (1991),76 Ohio App.3d 3, 10.
 {¶ 19} In his first assignment of error, plaintiff contends the trial court erred in denying plaintiff's motion for judgment notwithstanding the verdict because reasonable minds could not reach a conclusion adverse to plaintiff concerning the issues of negligence and proximate cause. Plaintiff first asserts the trial court impermissibly considered the weight and credibility of expert testimony when, in denying plaintiff's motion, it noted the medical specialties of the parties' experts. Contrary to plaintiff's contention, the trial court properly noted "the Court may not assign weight or believability to the evidence or witnesses in deciding this portion of Plaintiff's motion." (Decision, 2.) Without more, the mere fact the trial court noted the medical specialties of the parties' experts in summarizing conflicting expert testimony does not indicate the trial court improperly weighed the evidence or the credibility of the experts.
 {¶ 20} In further support of the assignment of error, plaintiff notes portions of his own trial testimony as well as the trial testimony of his expert, John W. Dietrich, M.D. Plaintiff also criticizes selected excerpts of the trial testimony of defendants' experts. He combines both elements to argue reasonable logical inferences support his claim that defendants failed to present substantial evidence to refute plaintiff's allegations.
 {¶ 21} "In general, if different inferences can be drawn from the evidence, questions of fact are presented for the jury." Lefferson v. Burnett (App. 1952), 69 Ohio Law Abs. 28, 30. Whether an inference is made is a matter left to the discretion of a jury. See, e.g., Hurt v. Charles J. Rogers Transp. Co. (1955), 164 Ohio St. 329, paragraph three of the syllabus ("It is permissible for a jury to draw several conclusions of presumptions of fact from the same set of facts and equally permissible for a jury to use a series of facts or circumstances as a basis for ultimate findings or inferences"). "The general rule is that when the issues must be determined from conflicting evidence or where the evidence gives rise to conflicting inferences, a motion for directed verdict must be denied." Davis v. Najm (1963), 120 Ohio App. 421,423. See, also, Hamden Lodge No. 517, I.O.O.F. v. Ohio Fuel Gas Co. (1934), 127 Ohio St. 469, paragraph four of the syllabus ("[w]here from the evidence reasonable minds may reasonably reach different conclusions upon any question of fact, such question of fact is for the jury. The test is not whether the trial judge would set aside a verdict on the weight of the evidence").
 {¶ 22} Here, plaintiff contends his expert's testimony, along with selected excerpts from cross-examination testimony of defendants' experts, established Dr. Smith's practice fell below the standard of care, and that Dr. Smith's negligence was the direct and proximate cause of plaintiff's loss of muscle, function and sensation. By contrast, Dr. James Hoekstra, one of defendants' experts, testified that Dr. Smith complied with the accepted standard of care of a reasonably prudent emergency room physician when he treated plaintiff on June 9, 1997, and that Dr. Smith made adequate follow-up arrangements in light of Dr. Smith's determination that plaintiff suffered a contusion. In his own defense, Dr. Smith himself testified about his decision to change plaintiff's pain medication based on his discussion with the emergency room nurse and the representations the nurse made. Dr. Smith also testified he had never seen a patient admitted to the hospital to determine whether the patient may develop a compartment syndrome.
 {¶ 23} Accordingly, despite plaintiff's contentions to the contrary, the record contains substantial competent evidence that allows reasonable minds to reach different conclusions about whether Dr. Smith complied with the accepted standard of care of a reasonably prudent emergency room physician on June 9, 1997. The trial court did not err in denying plaintiff's motion for judgment notwithstanding the verdict. Accordingly, plaintiff's first assignment of error is overruled.
 {¶ 24} In his second assignment of error, plaintiff contends the trial court erred in denying plaintiff's motion for a new trial because the judgment is not supported by the weight of the evidence. "It is well-settled law that the decision on motion for a new trial pursuant to Civ.R. 59 is within the discretion of the trial court. The trial court's decision will be disturbed only upon a showing that such decision was unreasonable, unconscionable or arbitrary." Sharp v. Norfolk W. Ry. Co. (1995), 72 Ohio St.3d 307, 312, order clarified,73 Ohio St.3d 1429.
 {¶ 25} "In deciding a motion for a new trial based on the weight of the evidence, the trial court must weigh the evidence and pass upon the credibility of witnesses. However, the trial court's weighing of the evidence differs from that of the jury in that it is restricted to determining whether manifest injustice has been done and whether the verdict is, therefore, manifestly against the weight of the evidence. The court may not set aside a verdict on the weight of the evidence simply because its opinion differs from the jury's opinion." Jones v. Olcese (1991), 75 Ohio App.3d 34, jurisdictional motion overruled,62 Ohio St.3d 1456, citing Poske v. Mergl (1959), 169 Ohio St. 70. See, also, Atkinson v. Internatl. Technegroup, Inc. (1995), 106 Ohio App.3d 349, appeal not allowed, 74 Ohio St.3d 1525, quoting Rohde v. Farmer (1970),23 Ohio St.2d 82, paragraph three of the syllabus ("[I]n ruling on a motion for new trial upon the basis of a claim that the judgment `is not sustained by sufficient evidence,' the court must weigh the evidence and pass upon the credibility of the witnesses, not in the substantially unlimited sense that such weight and credibility are passed on originally by the jury but in the more restricted sense of whether it appears to the trial court that manifest injustice has been done and that the verdict is against the manifest weight of the evidence").
 {¶ 26} Here, as noted, defendants' expert, Dr. James Hoekstra, testified Dr. Smith complied with the accepted standard of care of a reasonably prudent emergency room physician when he treated plaintiff on June 9, 1997. Dr. Hoekstra also testified Dr. Smith made adequate follow-up arrangements in light of Dr. Smith's determination that plaintiff suffered a contusion as a result of the crush injury. Such testimony, if the jury believed it, constitutes some competent, credible evidence going to all the essential elements of the case and provides a reasonable foundation for the jury's verdict. Accordingly, the jury's verdict was not against the manifest weight of the evidence and was not a manifest injustice; the trial court did not abuse its discretion in denying plaintiff's motion for a new trial. Plaintiff's second assignment of error is overruled.
 {¶ 27} Plaintiff's third assignment of error contends the trial court erred in instructing the jury that plaintiff's case concerned Dr. Smith's failure to timely diagnose and appropriately manage a compartment syndrome in plaintiff's left arm. Plaintiff, instead, contends the trial court should have instructed the jury that plaintiff's case concerned Dr. Smith's failure to manage or treat a crush injury.
 {¶ 28} Although the parties did not raise the issue, the record is ambiguous about the timeliness of plaintiff's objection to the trial court's jury instruction. Civ.R. 51(A) provides that "[o]n appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. * * *" See, also, Schade v. Carnegie Body Co. (1982),70 Ohio St.2d 207, paragraph one of the syllabus ("[w]hen a party fails to object to the giving of or failure to give a jury instruction before the jury retires to consider a verdict, the party may not assign as error the giving of or failure to give such instruction").
 {¶ 29} An exception to the waiver rule may excuse a failure to timely object. "Where the record affirmatively shows that a trial court has been fully apprised of the correct law governing a material issue in dispute, and that the complaining party has unsuccessfully requested the inclusion of that law in the trial court's charge to the jury, such party does not waive his objections to the court's charge by failing to formally object thereto." Presley v. City of Norwood (1973),36 Ohio St.2d 29, paragraph one of the syllabus. See, also, Berge v. Columbus Community Cable Access (1999), 136 Ohio App.3d 281, 314-315, appeal not allowed (2000), 88 Ohio St.3d 1503. "`Presley is most appropriately applied when the appellant formally requested a particular instruction and the transcript of the trial reflects that the issue had been argued to the trial court during a conference or hearing on the jury instructions.'" Id. at 315, quoting DuBoe v. Accurate Fabrication, Inc. (July 20, 1999), Franklin App. No. 98AP-842, discretionary appeal not allowed, 87 Ohio St.3d 1453.
 {¶ 30} Here, after the jury retired to deliberate, plaintiff objected on the record to the trial court's instruction. The objection, standing alone, is inadequate to preserve plaintiff's objection. Following plaintiff's objection, the court stated, "[w]ait a minute. Now, in regard to [plaintiff's] objection, I read exactly to the Jury exactly what the Plaintiff proposed. I think you wanted me to change it after; I refused to do that." (Tr. 946-947.) See, also, plaintiff's proposed jury instructions, filed November 27, 2001. The trial court's comment suggests plaintiff objected prior to the jury charge, but the record is not clear what plaintiff's counsel stated to the trial court or requested be changed. Plaintiff arguably waived any error in the court's instruction. Nonetheless, for purposes of our analysis, we assume plaintiff to some extent preserved his objection.
 {¶ 31} "The precise language of a jury instruction is within the discretion of the trial court." Toth v. The Oberlin Clinic, Inc., Lorain App. No. 01CA007891, 2002-Ohio-2211, at ¶ 44, appeal not allowed,96 Ohio St.3d 1495, 2002-Ohio-4534, citing Youssef v. Parr, Inc. (1990),69 Ohio App.3d 679, 690, jurisdictional motion overruled (1991),58 Ohio St.3d 703. "In determining the appropriateness of jury instructions, an appellate court reviews the instructions as a whole. * * * If, taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled. * * * Moreover, misstatements and ambiguity in a portion of the instructions will not constitute reversible error unless the instructions are so misleading that they prejudicially affect a substantial right of the complaining party." Wozniak v. Wozniak (1993),90 Ohio App.3d 400, 410, cause dismissed (1994), 68 Ohio St.3d 1440. (Citations omitted.) See, also, Yeager v. Riverside Methodist Hosp. (1985), 24 Ohio App.3d 54, 55-56.
 {¶ 32} "Reversible error ordinarily can not be predicated upon one paragraph, one sentence or one phrase of the general charge to the jury. Where the court's charge to the jury, considered as a whole, is not prejudicial to the objecting party, no reversible error results from a misstatement or ambiguity in a portion thereof." Snyder v. Stanford (1968), 15 Ohio St.2d 31, paragraph three of the syllabus, following and approving State v. Porter (1968), 14 Ohio St.2d 10.
 {¶ 33} Here, the trial court's jury instructions stated, "[o]f course, now getting a little more specifically to the issues in this case, the Plaintiff contends that the Defendant, Dr. Smith, rendered inappropriate medical care, diagnosis and/or treatment in failing to timely diagnose and appropriately manage the compartment syndrome of his left arm." (Tr. 923.) Plaintiff contends the instruction is flawed because the issue at trial concerned Dr. Smith's failure to diagnose and manage plaintiff's crush injury, not plaintiff's compartment syndrome. See, e.g., Matheny v. Fairmont Gen. Hosp., Inc. (W.Va. 2002),575 S.E.2d 350.
 {¶ 34} Initially, we note that on the day trial commenced, plaintiff filed proposed jury instructions; in instructing the jury, the trial court, as relevant here, read verbatim from plaintiff's proposed instructions. Moreover, although plaintiff asserted in closing argument that plaintiff did not have a compartment syndrome on June 9, 1997, plaintiff contradicted that statement during the trial when plaintiff argued his case was about a compartment syndrome and asserted the issue was whether plaintiff's compartment syndrome was developing.
 {¶ 35} More specifically, on direct examination of plaintiff's expert, plaintiff noted "[t]his case is about a compartment syndrome; a crush injury," and then inquired how a crush injury progresses and a compartment syndrome develops. (Tr. 165.) Moreover, plaintiff's questions to his expert witness, Dr. Dietrich, elicited testimony that Dr. Smith fell below the standard of care in (1) failing to suspect compartment syndrome, given the mechanism of plaintiff's injury, (2) failing to recognize plaintiff's pain as the "hallmark of a developing compartment syndrome," [Tr. 43] and (3) instructing plaintiff to ice and elevate his arm, as "that has absolutely no treatment in the place of compartment syndrome." (Tr. 188-189.) Indeed, later, when inquiring about the correctness of Dr. Smith's aftercare instruction to ice and elevate plaintiff's arm, plaintiff represented to the court that the "issue [was] whether the compartment syndrome was developing[.]" As a result, the inferences plaintiff raised through his questions to and answers from his expert, as well as the representations plaintiff made to the court, support the trial court's instruction.
 {¶ 36} In the final analysis, the jury instructions, taken in their entirety, fairly and correctly stated the law applicable to the evidence presented at trial: was Dr. Smith negligent in his care, diagnosis or treatment of plaintiff on June 9, 1997. The language in the trial court's jury instruction could have been changed to comply with plaintiff's evolving concept of his case. Nonetheless, because the jury instructions fairly covered the points raised in the evidence, the record fails to support a finding of prejudice or reversible error. See, e.g., Soda v. Baird (1991), 411 Pa. Super. 80, 94-95, 600 A.2d 1274, appeal denied (1992), 532 Pa. 665, 616 A.2d 986. Accordingly, plaintiff's third assignment of error is not well-taken and is overruled.
 {¶ 37} Having overruled plaintiff's three assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
LAZARUS and KLATT, JJ., concur.